UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CPM ACQUISITION CORP.,

    Plaintiff,

                                    Case No. 1:24-cv-605

v.

                                    Hon. Hala Y. Jarbou

BRANDON EASTERDAY, et al.,

    Defendants.

_____/

## OPINION

Plaintiff CPM Acquisition Corp. ("CPM") brings this action against Brandon Easterday and James Drummond for breach of contract and misappropriation of trade secrets. CPM also sues C.A. Picard, Inc. ("Picard") for tortious interference. CPM alleges that Easterday and Drummond left CPM to work for its competitor, Picard, in violation of their noncompete agreements. CPM further alleges that Picard solicited Easterday and Drummond and that the two individuals used or have threatened to use proprietary information to give Picard an unfair competitive advantage over CPM.

Before the Court is CPM's motion to preliminarily enjoin Easterday and Drummond's employment with Picard (ECF No. 3). CPM initially sought a temporary restraining order, which this Court denied (ECF No. 6). All Defendants have now responded. As discussed in its June 10, 2024 Order, the Court is satisfied that it has subject matter jurisdiction over this matter under 28 U.S.C. § 1332.

# I. BACKGROUND

## A. CPM and the Extrusion Industry

CPM is "a leading supplier of processing equipment and aftermarket parts for the animal feed, biofuel, and food process industries." (Spearing Decl. ¶ 5, ECF No. 3-1.)   Relevant to this action is the Century Extrusion operating unit of CPM which "manufactures and sells extruder parts and systems with a high level of specification for various customer requirements." (*Id.* ¶ 7.) The extrusion industry appears to be relatively small; "[t]here are only a handful of other companies that do this in the United States, including C.A. Picard." (*Id.* ¶ 8.)

Picard avers that the extrusion industry can be further delineated between single-screw extrusion machines and twin-screw extrusion machines.  (Alderton Decl. ¶¶ 5, 7, ECF No. 19-1.) Picard "develops and manufactures" parts for both single- and twin-screw extrusion machines while CPM markets parts only for a subset of the twin-screw market, "co-rotating twin screw machines." (*Id.* ¶ 7; *see also* Ross Suppl. Decl. ¶ 4-5, ECF No. 21-2.)  Picard estimates that there are about 1,500 customers in North America and 500 single-screw customers.  (*Id.* ¶ 8.)  It is unclear if those 500 single-screw customers are in addition to or included in the 1,500 North America figure.  CPM suggests that "[i]n many cases, the customers overlap and visiting a customer that employs both technologies would require a salesperson to discuss both." (Ross Suppl. Decl. ¶ 3.)

## B. Drummond and Easterday's Roles at CPM

CPM hired Drummond in 2009.  (Spearing Decl. ¶ 9.)  His most recent role at CPM was "Aftermarket Outside Sales Manager" which entailed managing the outside sales team and directly interacting with the company's "largest North American customers." (*Id.* ¶ 12.)  Drummond signed a noncompete and confidentiality agreement when he began at CPM in 2009.  (Drummond Noncompete, ECF No. 3-1, PageID.72.)  He apparently signed the noncompete when he was hired

2

as an intern in 2009 and has not signed any subsequent agreements despite changing roles throughout his employment.  As part of his most recent role, CPM contends that Drummond "had access to global customer lists, cost data, product technology data, the buying history of all customers, and proprietary intellectual property information."  (Spearing Decl. ¶ 13.)

CPM first hired Easterday in 2013 as a machinist.  (*Id.* ¶ 14.)  Like Drummond, Easterday signed a noncompete and confidentiality agreement when he began at CPM and has apparently not signed a similar agreement since.  (Easterday Noncompete, ECF No. 3-1, PageID.80.)  Eventually, Easterday joined the sales side of CPM where he reported directly to Drummond.  (Spearing Decl. ¶ 15.)  Easterday allegedly had access to the same proprietary information as Drummond.  (*Id.* ¶ 16.)  Additionally, CPM avers that Easterday's initial role as a machinist gave him "deep knowledge of CPM's processes and technology data."  (*Id.* ¶ 14.)

Picard avers that CPM's use of noncompete agreements is an anomaly in the extrusion industry.  (Alderton Decl. ¶¶ 9-11.)  Picard contends that "employees in the industry frequently move from one company to another" and that it recently "hired three individuals who were previously employed by [two other competitors,]" none of whom "were subject to noncompete restrictions" despite having "had the same kind of access to their prior employers' information that Mr. Easterday and Mr. Drummond had with CPM."  (*Id.* ¶ 11.)  Likewise, Picard does not require its employees to sign noncompete agreements.  (*Id.*)

### C. Drummond and Easterday Interact with Alderton

Sometime in 2023, Guy Alderton, Vice President of Sales at Picard, informed Drummond and Easterday that "Picard was hiring if they kn[e]w anyone in the extrusion business looking for a job."  (Alderton Decl. ¶¶ 1, 14.)  Prior to working at Picard, Alderton served as CPM Century Extrusion's Director of Sales for the Americas.  (*Id.* ¶ 3.)  Drummond and Easterday both worked under Alderton while he was at CPM.  (*Id.* ¶ 13.)  Alderton avers that his 2023 conversation with

Drummond and Easterday stemmed from his relationship with them "as friends and acquaintances in the industry" and that "in light of how long they had been with CPM, [he] did not anticipate that they would be interested in switching companies."  (*Id.* ¶ 14.)

Several months after this conversation, Drummond and Easterday informed Alderton that they were interested in switching to Picard.  (*Id.* ¶ 15.)  At some point in the spring of 2024, apparently after a tentative agreement was reached for Drummond to join Picard, Drummond wrote a letter to Alderton, sketching out a "business plan" for his role at Picard.  (Drummond Letter to Alderton, ECF No. 3-3, PageID.158.)  The most relevant portion of the letter is as follows:

> I would like to share the following thoughts regarding growth in Latin America (as well as the rest of North America and potentially Asia):
> - I believe Mexico alone could become a $800k-1M territory per year after 1-2 years of developmental work, including:
>   - Working existing accounts to increase share of wallet.  Some methods for achieving this which I have been employing over the years:
>     - Promoting strong service level and maintenance/metallurgy knowhow.
>     - Stocking Agreements
>     - Pricing and tiered discount agreements
>     - Service agreements.
>     - Focus on solving customer's pain points.
>   - Bringing in new revenue from accounts I am aware of (I have a pretty strong understanding of this market after comparing notes with our Global Service Manager who we hired from Coperion).
>   - Capitalizing on shorter lead times and more competitive pricing (when applicable).
>   - Working alongside and educating ABC Plasticos OR developing a new sales rep for this territory (Plastimagen show in Mexico City is a good opportunity to do this).
> - I believe this same approach could be applied to the remainder of Latin America as well, but it's a little more difficult to estimate figures without more knowledge of the single screw market.
> - A goal of mine would be to increase my understanding and target food extrusion customers in South America as well (both single and twin).
> - Receiving training on single screw aftermarket technology (as well as customer base) would be needed for me to work on and grow this side of the business.

- I also believe my presence would benefit your key accounts (U.S. and abroad) as I have found success at understanding the needs of and growing share of wallet with out key accounts in my current role.  You mentioned that you handle most of this work yourself, I would be happy to work alongside you with this as you mentioned you are trying to build a team who can take over this work since some of your leadership is close to retiring.
- I realize this region is largely managed by Germany and China, but I have a very strong understanding of South Korea and Taiwan as well (just like Mexico) and would be happy to assist with development of this region as needed.

(*Id.*)

### D. Drummond and Easterday Resign

Drummond and Easterday submitted their resignations to CPM on May 15, 2024. (Spearing Decl. ¶ 20.)  Although they gave two weeks' notice, CPM froze their access to company systems and prevented them from returning to work on the suspicion that they were going to work for Picard.  (*Id.*)

Indeed, Picard offered employment to Easterday on April 6, 2024 (Easterday Offer Letter, ECF No. 19-1, PageID.282), and to Drummond on April 26, 2024 (Drummond Offer Letter, ECF No. 19-1, PageID.279).  Both were slated to begin on June 1, 2024.  Easterday was offered the position of Regional Sales Manager while Drummond was offered "Sales Director LATAM." Both offer letters contained the following provision:

> Without limiting the scope of the foregoing, your employment with C.A. Picard, Inc. is based on your representation that you are under no enforceable contractual or other restriction that would prohibit you from accepting the employment with C.A. Picard, Inc. described herein.  Should you be subject to such restriction, or should a reasonable good faith dispute arise as to whether you are subject to restriction, C.A. Picard, Inc. reserves the right to terminate your employment immediately and without further notice.  Further, C.A. Picard, Inc. prohibits you from using any confidential information or otherwise protected information you obtained from any prior employment in the course of performing your duties for C.A. Picard, Inc.  Your improper use of any such prior employer's confidential or protected information will likewise be grounds for the immediate termination of your employment with C.A. Picard, Inc.

(*Id.*, PageID.280.)

5

### E. CPM Issues Letters Following Drummond Easterday's Resignations

On May 17, 2024, CPM issued letters to Drummond and Easterday "reminding them of their post-employment obligations of confidentiality, non-competition and non-solicitation obligations." (Spearing Decl. ¶ 21.)  On May 28, 2024, CPM's outside counsel issued a letter to Picard, informing it of Drummond and Easterday's noncompete agreements.  (*Id.* ¶ 22.)  Picard apparently did not respond to CPM but did issue an addendum to both Drummond and Easterday's employment offers.  (Drummond Addendum, ECF No. 19-1, PageID.284; Easterday Addendum, ECF No. 19-1, PageID.285.)  The addendum reiterated and clarified the scope of Drummond and Easterday's job duties and expectations:

> First and foremost, the responsibilities associated with your employment . . . is for our Pet Food and Fish Food product lines.  You are in no way expected to, or authorized to, be involved with any products or parts sold by CPM or in industries CPM served during your employment there.  You should not solicit business from or attempt to influence any of CPM's customers, vendors, or employees in any manner that competes with CPM's business.
>
> Second, as already outlined in your original offer letter, you are prohibited from in any way using or disclosing any trade secret, confidential, or otherwise protected information you obtained as a consequence of your prior employment with CPM or any other employer in the course of performing your duties for C.A. Picard, Inc.

(Drummond Addendum, Page ID.284; Easterday Addendum, PageID.285.)  Drummond and Easterday each signed their respective addenda.

### F. CPM Hires a Forensic Analyst

Following their resignations, CPM hired a digital forensic analyst, Robert Hartkemeyer, to investigate Drummond and Easterday's CPM-issued laptops.  (Ross Decl. ¶ 41.)  Hartkemeyer's role was and is "to analyze and investigate the potential unauthorized acquisition and use of CPM's confidential information" by Drummond and Easterday.  (Hartkemeyer Decl. ¶ 3, ECF No. 3-3.) Hartkemeyer avers that both Easterday and Drummond "accessed files containing CPM confidential information in the days leading up to their resignation of employment" and that both

"plugged in USB devices . . . at or around the same time they were accessing files containing CPM confidential information." (*Id.* ¶¶ 28-29.)  Although his investigation is necessarily incomplete at this stage because he has so far been limited to CPM laptops, Hartkemeyer "believe[s] it is reasonable to conclude that one or both of the former employees transferred key company files on or around the last days of their employment." (*Id.* ¶ 29.)

Hartkemeyer has provided the file names of the documents Easterday and Drummond allegedly accessed and modified. (*See id.* ¶¶ 59-62; File List, ECF No. 3-3, PageID.141-156.)  The following is an illustrative sample:

| | | |
|---|---|---|
| 05/15/24 03:46:49 PM (-5:00 Central Daylight Time) | 03/21/24 12:51:01 AM (-5:00 Central Daylight Time) | 📁 Current Presentations |
| 05/15/24 03:46:49 PM (-5:00 Central Daylight Time) | 03/27/24 08:56:10 AM (-5:00 Central Daylight Time) | 📁 Extrusion US AM Sales |
| 05/15/24 03:46:49 PM (-5:00 Central Daylight Time) | 04/30/24 08:13:35 PM (-5:00 Central Daylight Time) | 📁 Desktop Files |
| 05/15/24 03:51:41 PM (-5:00 Central Daylight Time) | 05/10/24 10:14:32 AM (-5:00 Central Daylight Time) | 📄 desktop.ini |
| 05/13/24 02:58:19 PM (-5:00 Central Daylight Time) | 05/13/24 02:57:50 PM (-5:00 Central Daylight Time) | 📄 NPE Info and 2 Pagers.pdf |
| 05/13/24 04:03:23 PM (-5:00 Central Daylight Time) | 05/13/24 03:30:14 PM (-5:00 Central Daylight Time) | 📄 NPE2024 Registration Confirmation & Key Show Informati… |
| 05/15/24 03:46:49 PM (-5:00 Central Daylight Time) | 05/13/24 04:02:59 PM (-5:00 Central Daylight Time) | 📁 Resume & Stuff |
| 05/15/24 03:46:49 PM (-5:00 Central Daylight Time) | 05/13/24 04:02:59 PM (-5:00 Central Daylight Time) | 📁 Misc |
| 05/13/24 05:41:23 PM (-5:00 Central Daylight Time) | 05/13/24 04:03:01 PM (-5:00 Central Daylight Time) | 📄 Copy of Inj Nozzle Specification Worksheet.xls |
| 05/15/24 03:51:41 PM (-5:00 Central Daylight Time) | 05/15/24 10:31:10 AM (-5:00 Central Daylight Time) | 📁 Open Expenses |
| 05/15/24 11:03:05 AM (-5:00 Central Daylight Time) | 05/15/24 11:02:30 AM (-5:00 Central Daylight Time) | 📄 Easterday letter.docx |
| 05/15/24 02:00:08 PM (-5:00 Central Daylight Time) | 05/15/24 02:00:07 PM (-5:00 Central Daylight Time) | 📄 Drummond letter.docx |
| 05/15/24 02:00:09 PM (-5:00 Central Daylight Time) | 05/15/24 02:00:09 PM (-5:00 Central Daylight Time) | 📄 Sabic 2022 to April 2024 CPM Orders.xlsx |
| 05/15/24 02:00:08 PM (-5:00 Central Daylight Time) | 05/15/24 03:51:36 PM (-5:00 Central Daylight Time) | 📄 MasterListLeads_NPE2024.xlsx |

(Hartkemeyer Decl. ¶ 59.)  Among the files accessed, CPM stresses the "MasterListLeads" file, which allegedly "contains all of the new customer contacts generated by CPM's marketing efforts." (Ross Decl. ¶ 28.)  These files, including the MasterListLeads file, were apparently accessed and modified on May 15, 2024.

Hartkemeyer also identified several "Link" files, which he believes indicates creating and downloading files to a USB device.  Drummond allegedly created the following Link files:

| | | | |
|---|---|---|---|
| 04/30/24 08:15:38 PM (-5:00 Ce... | 🖹 AM.lnk | 0 | D:\AM |
| 04/30/24 08:26:54 PM (-5:00 Ce... | 🖹 NES.lnk | 0 | D:\NES |
| 04/30/24 08:26:56 PM (-5:00 Ce... | 🖹 obit-2.docx.lnk | 0 | D:\NES\obit-2.docx |
| 04/30/24 08:11:32 PM (-5:00 Ce... | 🖹 Stuff (2).lnk | 0 | D:\Resume & Stuff |
| 04/30/24 08:41:52 PM (-5:00 Ce... | 🖹 Misc.lnk | 0 | D:\Resume & Stuff\Misc |
| 04/30/24 08:36:54 PM (-5:00 Ce... | 🖹 Pics.lnk | 0 | D:\Resume & Stuff\Pics |
| | 🖹 Resume && Stuff.lnk | 0 | D:\Resume && Stuff |

(Hartkemeyer Decl. ¶ 58.)  And Easterday allegedly created the following Link files:

| |
|---|
| D:\Mexico visits |
| D:\new folder 9\NIXMOTO#2\Contacts.CSV |
| D:\new folder 9\NIXMOTO#2\emails.docx |
| D:\new folder 9\NIXMOTO#2\Travel docs.docx |
| D:\new folder 9\NIXMOTO#2\Traverse City Aftermarket Accounts List 06-22-23.xlsx |

(*Id.* ¶ 45.)

Finally, since CPM's initial motion, Hartkemeyer analyzed a USB device used by Drummond in his final days at CPM.  This analysis apparently shows that on May 13, 2024, Drummond inserted a USB device which had previously contained the following files:

| | Name | Description | Last Accessed |
|---|---|---|---|
| 1 | $Boot0 | File, Internal | |
| 2 | $Boot1 | File, Internal | |
| 3 | $FAT Alignment | File, Internal | |
| 4 | Primary FAT | File, Internal | |
| 5 | $Bitmap | File, Internal | |
| 6 | $UpCase | File, Internal | |
| 7 | System Volume Information | Folder, Hidden, System | 03/10/23 08:09:26 AM (-6:00 Central Standard Time) |
| 8 | Personal Folders(1).pst | Folder, Overwritten, Archive | 03/10/23 08:09:42 AM (-6:00 Central Standard Time) |
| 9 | Resume & Stuff | Folder, Read Only | 04/30/24 08:11:32 PM (-5:00 Central Daylight Time) |
| 10 | Misc | Folder, Deleted, Overwritten | 04/30/24 08:12:08 PM (-5:00 Central Daylight Time) |
| 11 | Mexico Itinerary 03-15-24.docx | File, Deleted, Overwritten, Archive | 04/30/24 08:14:24 PM (-5:00 Central Daylight Time) |
| 12 | CX Parts Cost Plus and Intercompany Rules 2023.pdf | File, Deleted, Overwritten, Archive | 04/30/24 08:14:24 PM (-5:00 Central Daylight Time) |
| 13 | Material Reference - External rev. 5; 2-3-22.pdf | File, Deleted, Archive | 04/30/24 08:14:24 PM (-5:00 Central Daylight Time) |
| 14 | Material Reference - Internal rev. 5; 2-3-22.pdf | File, Deleted, Archive | 04/30/24 08:14:24 PM (-5:00 Central Daylight Time) |
| 15 | Mex Notes.docx | File, Deleted, Overwritten, Archive | 04/30/24 08:14:24 PM (-5:00 Central Daylight Time) |
| 16 | Mexico follow up 03-26-24.xlsx | File, Deleted, Overwritten, Archive | 04/30/24 08:14:24 PM (-5:00 Central Daylight Time) |
| 17 | What is a Twin-Screw Extruder.pdf | File, Deleted, Archive | 04/30/24 08:14:40 PM (-5:00 Central Daylight Time) |
| 18 | Sales Roles.xlsx | File, Deleted, Archive | 04/30/24 08:15:16 PM (-5:00 Central Daylight Time) |
| 19 | ideas behind territory scope and new customers.docx | File, Deleted, Archive | 04/30/24 08:15:18 PM (-5:00 Central Daylight Time) |
| 20 | US Extrusion AM Sales Structure Proposals 08-22-23.pptx | File, Deleted, Archive | 04/30/24 08:15:20 PM (-5:00 Central Daylight Time) |
| 21 | FY2024 Growth Path 2.0.pptx | File, Deleted, Archive | 04/30/24 08:15:22 PM (-5:00 Central Daylight Time) |
| 22 | FY2024 Restructuring.pptx | File, Deleted, Archive | 04/30/24 08:15:26 PM (-5:00 Central Daylight Time) |
| 23 | Extrusion AM US FY2024 Sales Team Restructuring Plan.pptx | File, Deleted, Archive | 04/30/24 08:15:28 PM (-5:00 Central Daylight Time) |
| 24 | CPM Aftermarket Call Planner.xlsx | File, Deleted, Archive | 04/30/24 08:15:30 PM (-5:00 Central Daylight Time) |
| 25 | Aftermarket Sales Manager (9-12-23) FINAL VERSION.pdf | File, Deleted, Archive | 04/30/24 08:15:32 PM (-5:00 Central Daylight Time) |
| 26 | AM Sales Team Daily Time Allocation (by %).xlsx | File, Deleted, Archive | 04/30/24 08:15:34 PM (-5:00 Central Daylight Time) |
| 27 | AM | Folder | 04/30/24 08:15:38 PM (-5:00 Central Daylight Time) |
| 28 | NES | Folder | 04/30/24 08:26:54 PM (-5:00 Central Daylight Time) |
| 29 | Distribution list 11-22-16.xls | File, Deleted, Archive | 04/30/24 08:27:22 PM (-5:00 Central Daylight Time) |
| 30 | jj_menu_no_prices (1).pdf | File, Deleted, Archive | 04/30/24 08:28:00 PM (-5:00 Central Daylight Time) |
| 31 | 2016 Webinar Presenter & Moderator Schedule.xlsx | File, Deleted, Overwritten, Archive | 04/30/24 08:28:04 PM (-5:00 Central Daylight Time) |
| 32 | CX Common Materials.xlsx | File, Deleted, Archive | 04/30/24 08:29:38 PM (-5:00 Central Daylight Time) |
| 33 | 2017 Visitor Information.xlsx | File, Deleted, Overwritten, Archive | 04/30/24 08:29:54 PM (-5:00 Central Daylight Time) |
| 34 | Janik VM.wav | File, Deleted, Archive | 04/30/24 08:29:58 PM (-5:00 Central Daylight Time) |
| 35 | Volume Slack | File, Unallocated Clusters | |
| 36 | Unallocated Clusters | File, Unallocated Clusters | |

(Hartkemeyer Suppl. Decl., ECF No. 21-3, PageID.341.) These files were apparently deleted on April 30, 2024, the day after Drummond accepted Picard's offer of employment.  Of these files, CPM stresses "three documents about Mexico, 'ideas behind territory scope and new customers,' Powerpoint presentations about 2024 Growth and Restructuring, an Excel 'Aftermarket Call Planner' and other documents."  (*Id.* ¶ 8.)  Hartkemeyer reiterates that his investigation is incomplete as he is unable to determine what, if any, files were actually transferred to devices beyond the CPM laptop and USB.

## II. LEGAL STANDARD

Whether to issue a preliminary injunction is in the discretion of the district court.  *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015).  A court considers and balances four factors: (1) whether the movant has established a substantial likelihood or probability of success on the merits; (2) whether the movant would suffer irreparable injury without the preliminary injunction; (3) whether the issuance of the preliminary injunction would cause substantial harm to others; (4) whether the public interest would be served by issuance of the preliminary injunction. *Kentucky v. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014).  Each factor should "be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014).

A "preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks and citation omitted).  An injunction at this stage should "only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).

A federal court sitting in diversity "appl[ies] [its] own procedural jurisprudence regarding the factors to consider in granting a preliminary injunction, and appl[ies] state law only as to the question of whether a plaintiff has shown a substantial likelihood of success on the merits of the underlying diversity action." *Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*, No. 23-1410, 2023 WL 6601863, at *2 (6th Cir. Oct. 10, 2023) (cleaned up).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

To show a strong likelihood of success on the merits, CPM must show "more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). A party "is not required to prove his case in full" to obtain a preliminary injunction. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). "It is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* (citing *Six Clinics*, 119 F.3d at 402) (internal quotation marks and alterations omitted).

CPM asserts three claims against Defendants. The Court will analyze the likelihood of success on each claim. Note, any analysis is applicable only to the instant motion; no finding or conclusion is binding on the Court or the parties in the future.

### 1. Breach of Contract Against Drummond and Easterday

To prevail on its breach of contract claim, CPM must demonstrate both that the noncompete provision is enforceable and that Drummond and Easterday breached it. Defendants challenge both points.

### (a) Enforceability

Michigan law allows for the enforcement of a noncompete provision so long as "the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business."  Mich. Comp. Laws § 445.774a(1).  If an agreement is found to be unreasonable in part, "a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited."  *Id.*

Drummond and Easterday's noncompete agreements covered a period of two years following their termination from CPM.  (Drummond Noncompete, PageID.73; Easterday Noncompete, PageID.80.)  Michigan courts have upheld noncompete agreements that span several years.  *Rooyakker & Sitz, P.L.L.C v. Plante & Moran, P.L.L.C.*, 742 N.W.2d 409, 415 (Mich. Ct. App. 2007) (upholding a two-year noncompete); *Brillhart v. Danneffel*, 194 N.W.2d 63, 64 (Mich. Ct. App. 1971).  Defendants do not appear to challenge the reasonableness of the duration of the noncompete, and the Court finds that the duration is reasonable.

Neither noncompete contains any geographical limitation.  "Geographic limitations in non-competition agreements must be tailored so that the scope of the agreement is no greater than is necessary to protect the employer's legitimate business interests."  *Quest Car Care Prods., Inc. v. Titus*, No. 1:23-cv-1066, 2023 WL 9472302, at *3 (W.D. Mich. Dec. 27, 2023) (citing *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994).  CPM operates nationwide as well as in parts of Europe and Asia in a relatively small industry with few competitors.  (Spearing Decl. ¶¶ 1, 8.)  Picard describes the industry similarly.  (Alderton Decl. ¶¶ 4-6, 8.)  In other words, the record indicates that the extrusion industry is concentrated among a few competitors who compete with one another on a national and global scale.  Thus, a narrower geographic scope would be unlikely to protect CPM's legitimate business interests.  Further, Drummond's job duties were international in scope, and Easterday's were national in scope.  So,

even if the lack of a geographic limitation were found to be unreasonable, the Court could limit the noncompete to the geographic scope of the employees' job duties. Mich. Comp. Laws 445.774a(1). Accordingly, the Court finds that CPM has at least shown a sufficient likelihood of success on the reasonableness of the geographic scope of the noncompete agreements.

The noncompete agreements are limited to "the business of the design, manufacture and assembly of extruding machines, extruder-related components, and replacement parts and other parts and components." (*See, e.g.*, Drummond Noncompete, PageID.73-74.) The Court finds that this is sufficiently narrow in scope as to be reasonable. Drummond and Easterday challenge the inclusion of both the single-screw and twin-screw extrusion machines into a single larger extrusion industry, but the Court is unpersuaded. CPM avers that despite the two product lines, many customers are in the market for both products. Thus, a former employee's relegation to the single-screw product line does not necessarily prevent him from marketing to a customer who uses both single-screw and twin-screw machines. This is sufficient at this stage to make this important question "fair ground for litigation and thus more deliberate investigation." *Certified Restoration*, 511 F.3d at 543.

 For purposes of the preliminary injunction, the Court concludes that both noncompete agreements are reasonable in duration and scope.

### (b) Breach

Drummond and Easterday agreed to not "be employed by . . . any business, person or entity engaging in the business of the design, manufacture and assembly of extruding machines, extruder-related components, and replacement parts and other parts and components." (*See, e.g.*, Drummond Noncompete, PageID.74.) However the extrusion market is subdivided, there is no dispute that Picard is CPM's competitor. The two companies at least compete for twin-screw

extrusion machine customers, and Drummond and Easterday left one to join another. This is a straightforward breach of the noncompete agreement.

Again, Drummond and Easterday attempt to challenge the breach by focusing on their relegation to the single-screw market. But the noncompete agreement is not so limited, and the Court is not persuaded it should so limit it. This is a matter worthy of further investigation and refinement, but CPM does not have to prove that point at this stage to show a likelihood of success on the merits.

### (c) Conclusion

CPM has demonstrated a likelihood of success on the merits of its breach of contract claim. Important questions remain, particularly surrounding the operation of the industry, but these questions are clearly fair grounds for litigation.

### 2. Tortious Interference Against Picard

Under Michigan law, the elements of tortious interference with a business relationship are (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damages to the plaintiff. *BPS Clinical Lab'ys v. Blue Cross & Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996). To succeed, CPM must establish "'the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.'" *ABO Staffing Servs., Inc. v. UnitedHealthcare Ins. Co.*, No. 22-cv-11696, 2024 WL 1256283, at *2 (E.D. Mich. Mar. 25, 2024) (quoting *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 157-58 (Mich. Ct. App. 2004)). It is "an essential element of a claim of tortious interference with a contract that the defendant

'unjustifiably instigated or induced' the party to breach its contract." *Knight Enters. v. RPF Oil Co.*, 829 N.W.2d 345, 348 (Mich. Ct. App. 2013).

CPM has adduced no evidence supporting a conclusion that Picard instigated or induced Drummond and Easterday to violate their noncompete agreements.  To the contrary, Picard's offer of employment was expressly conditioned on Drummond and Easterday's representation that they were not subject to noncompete agreements.  When CPM informed Picard of the agreements, Picard then issued an addendum to each agreement to cordon the employees off from competition with CPM.  This simply is not indicative of Picard instigating a breach.  Rather, it suggests a company attempting to pursue its legitimate business aims by hiring experienced salespeople without running afoul of their contractual obligations to a competitor.  A "defendant's legitimate business interests may shield it from liability in a tortious interference claim" so long as their actions do not "overreach the bounds of permissible interference and improperly sabotage the contractual agreements of others[.]"  *Kavanaugh v. VMC Indus., Inc.*, No. 213219, 2000 WL 33400199, at *3 (Mich. Ct. App. Nov. 21, 2000) (citing *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich. Ct. App. 1992);  *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 462-63 (Mich. Ct. App. 1989)).

Without evidence of Picard soliciting, instigating, or inducing Drummond and Easterday to breach their noncompete agreements (or even leave their former employer), CPM has failed to demonstrate a substantial likelihood of success on the merits on its tortious interference claim against Picard.

### 3. Misappropriation of Trade Secrets Against Drummond and Easterday

The Michigan Uniform Trade Secret Act ("MUTSA") prevents the misappropriation of trade secrets.  It defines misappropriation as the "[d]isclosure or use of a trade secret of another without express or implied consent[.]"  Mich. Comp. Laws § 445.1902(b)(ii).  Trade secret is

14

defined as "information, including a . . . method, technique, or process that" both "derives independent economic value, actual or potential, from not being generally known" and "[i]s the subject of efforts . . . to maintain its secrecy." *Id.* § 445.1902(d).  Customer lists may be protected trade secrets if they are covered by a confidentiality agreement and not easily ascertainable. *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 629 (E.D. Mich. 2005) (citing *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 615 (Mich. 1984)).  Information such as pricing lists, markups, marketing strategies, and contractual details are likely protected trade secrets under the MUTSA, *see, e.g.*, *Kelly Servs. v. Eidnes*, 530 F. Supp. 2d 940, 948-51 (E.D. Mich. 2008), as is information relating to "the peculiar needs of particular clients" if that "information increase[s] [one's] ability to compete," *Hayes-Albion*, 364 N.W.2d at 183.

CPM has adduced evidence showing that Drummond and Easterday accessed files that may contain information such as customer leads, pricing schedules, sales strategies, and contractual details.[1]  These files were accessed shortly before the two employees resigned and after they had accepted employment with Picard.  Some files related to CPM's Mexico operations were also placed on a USB by Drummond at some point and then deleted the day after accepting employment with Picard.  That is essentially the entire record before the Court on this claim.  Other than individual filenames and a vague description of the collective content, the Court has no record of

---

[1] CPM also takes issue with Easterday's "port" of his cellphone number from his company-issued phone to his personal phone.  (*See* Ross Decl. ¶ 24.)  But this cellphone number was apparently Easterday's *prior* to joining CPM; he first ported the number into the company in 2015.  (Easterday Decl. ¶ 6.)  When Easterday resigned, Human Resources told him he needed to receive approval from his manager to port his number back out.  He received that approval from Drummond, his manager.  CPM suggests that this was dishonest and fears that its customers "will unknowingly call or text Mr. Easterday and instead be contacting a direct competitor."  (Ross Decl. ¶ 25.)  But CPM has not shown that its market position is so precarious that it could not weather a current customer mistakenly calling a former employee.  Easterday followed the letter of company protocol to be able to secure the use of his pre-existing cellphone number, and CPM has not convinced the Court that this matter is so serious as to constitute a misappropriation of trade secrets or otherwise unfair competition.  The Court will exclude this issue from its analysis.

the details of these files, how the files are used, whether they left the physical or digital confines of CPM, or whether Drummond and Easterday provided any files to Picard.

Without more, it is difficult to discern the import of "accessing" files or even placing them on a USB.  For instance, Drummond avers that the Mexico-related files that he placed on the USB were related to a customer trip he took in March 2024.  (Drummond Decl. ¶ 39.)   He worked for CPM until May 15—that he would have those files on a USB a couple of months before his departure seems reasonable, and the fact that he deleted them the day after he accepted employment with Picard does not change that.  CPM fails to convince the Court that those actions were improper.

Still, reasonable inferences can be drawn that Drummond and Easterday accessed other sensitive and proprietary information with the intent and ability to gain a competitive advantage for Picard.  In particular, accessing a file labeled MasterListLeads on the final day of employment does raise a suspicion of at least the "threatened misappropriation" of trade secrets.  Mich. Comp. Laws § 445.1903(1) ("[a]ctual or threatened misappropriation may be enjoined").  Although the Court would need more information to decide the merits of this claim—namely, whether and which files were actually transferred—that is not required at this stage.  CPM acknowledges that its investigation is incomplete and that it intends to further analyze other devices should they be able to obtain them.  Although the issue is close, the Court finds that CPM has shown a sufficient likelihood of success on the merits of its trade secrets claim against Drummond and Easterday.

### B. Irreparable Harm

To be granted an injunction, CPM "must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury."  *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002).  The injury "'must be both certain and immediate,' not 'speculative or theoretical.'"  *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019).

Irreparable harm "is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.*

CPM alleges that it "will suffer injuries through loss of business and credibility in key markets, the destruction of invaluable industry relationships, and the undermining (and disclosure of) its strategies and confidential information to a direct competitor." (Pl.'s Mot. for Prelim. Inj. 15.) But rather than adduce evidence showing how such injuries will accrue, CPM relies almost exclusively on case law suggesting that the types of claims it asserts always constitute irreparable harm. For instance, CPM points to *Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992), for the notion that "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.* at 512. But the plaintiff in *Basicomputer* presented "ample evidence . . . that the defendants had access to confidential customer information . . . , that they removed much of this information when they left Basic for Sears, and that they promptly began contacting Basic's customers after arriving at Sears." *Id.* In other words, the court made a particularized finding of imminent harm.

Certainly, the breach of a noncompete agreement and the misappropriation of trade secrets *may* cause irreparable harm. But this does not vitiate the burden of showing—by clear and convincing evidence—that such harm is both imminent and likely. *See Patio Enclosures*, 39 F. App'x at 969 (affirming the denial of a preliminary injunction for noncompetition and trade secrets claims in part because plaintiff failed to demonstrate irreparable injury); *Apex Tool Grp., LLC v. Wessels*, 119 F. Supp. 3d 599, 609 (E.D. Mich. 2015) (denying a preliminary injunction for a breach of a noncompete agreement in part because plaintiff failed to establish how defendant's actions harmed or would likely harm its customer goodwill and competitive position). To obtain

such extraordinary relief, CPM must clearly show that it is likely to suffer imminent, irreparable harm.[2]

CPM certainly raises the specter of irreparable harm in its affidavits. For instance, Ross avers that Drummond and Easterday "were personally involved with and responsible for the development of customer relationships and service of customer contracts" and that they "have deep knowledge" of customer contact lists and contract information, "including when those contracts are due for re-negotiation" and "the cost and pricing data that go into negotiating each contract." (Ross Decl. ¶ 21). Standing alone, perhaps that would be sufficient. But Defendants raise significant questions about both the functioning of the extrusion industry and Drummond and Easterday's precise roles at Picard that CPM does not adequately address.

Picard describes an industry with "very few if any unknowns[.]" (Alderton Decl. ¶ 9.) It avers that "customers typically freely provide information and technical specifications on what they have and what they need" and "provide information about what they are paying their current suppliers." (*Id.*) This appears consistent with a relatively small industry where the customers are well known and where "the biggest point of differentiation is usually the lead time required to fill an order." (*Id.*) This is also consistent with an industry where noncompete agreements are not standard. In other words, it seems reasonable that an industry with few market unknowns and few sales-based opportunities for competitive advantages would also feature few noncompete agreements. In this scenario, noncompete agreements are unlikely to provide a firm with much value because the harms they would ordinarily prevent are negligible. It is difficult to "clearly

---

[2] CPM also points to the portion of Drummond and Easterday's noncompete agreement where they acknowledged that a violation would irreparably harm CPM. This is unpersuasive. First, these noncompete agreements were signed years ago while Drummond and Easterday occupied different roles—Drummond was apparently an intern and Easterday did not work in sales. Second, this does not absolve CPM of the need to clearly and convincingly show irreparable harm, nor does it absolve the Court of making those particularized findings.

show" a likely, imminent, and irreparable harm from the breach of a noncompete agreement if the industry does not meaningfully compete on the axis covered by such agreement. Defendants have raised a serious question that goes to the core of CPM's case—even if the noncompete agreement was breached, did that agreement have value in the first place?

CPM does not directly counter these points. It avers that it has long used noncompete agreements and that it "specifically instructs new employees that they must abide by their restrictive covenants." (Spearing Suppl. Decl. ¶¶ 3-4.) But this does not address Picard's declaration that CPM is alone in using noncompete agreements. CPM also avers that Picard's point that customers frequently know one another's pricing strategies "is not [its] experience" because "CPM does not solicit this kind of information from the new employee" and "[w]ith many customers, CPM enters into non-disclosure agreements" regarding pricing. (*Id.* ¶¶ 13-15.) Again, this does little to address Picard's description of the industry. Although the Court cannot resolve the competing affidavits, it is CPM's burden to clearly show it is entitled to relief.

Defendants also aver that Drummond and Easterday will not be competing with CPM because they will only work in the single-screw extrusion market, a market which CPM apparently does not service. CPM argues that there is significant overlap between the customers for single- and twin-screw extrusion markets and thus that any delineation is illusory. It also shares its concern that Drummond and Easterday are *really* working in the twin-screw extrusion market. But CPM adduces no evidence beyond a declaration to substantiate this. It argues,

> Even if C.A. Picard wants to claim that [Drummond and Easterday] are only responsible for [single-screw extrusion] sales, if they're sitting in the same potential customer pitch and there's a question about C.A. Picard's [twin-screw extrusion] abilities, they will use their knowledge of CPM's [twin-screw extrusion] capabilities, manufacturing information, and pricing strategies in order to pitch C.A. Picard's [twin-screw extrusion] aftermarket parts with their [twin-screw extrusion] counterparts at C.A. Picard.

(Ross Suppl. Decl. ¶ 9.)  To echo the Sixth Circuit and the district court in *D.T.*, "there's a lot of ifs in there."  *D.T.*, 942 F.3d at 327 (internal quotation marks and citations omitted).

The only other evidence CPM cites to substantiate its concern that Drummond and Easterday are working in the twin-screw market is the letter Drummond wrote to Alderton.  Indeed, Drummond noted, "A goal of mine would be to increase my understanding and target food extrusion customers in South America as well *(both single and twin)*."  (Drummond Letter to Alderton, PageID.158) (emphasis added).  But the full context of the letter provides ample reason to discount this.  Drummond repeatedly references his need to receive more training in the single-screw market: "it's a little more difficult to estimate figures without more knowledge of the single screw market[,]" "receiving training on single screw aftermarket technology (as well as customer base) would be needed for me to work on and grow this side of the business."  (*Id.*)  Also, while he tells Alderton "my presence would benefit your key accounts" because Drummond has "found success at understanding the needs of . . . our key accounts in my current role[,]"  he also acknowledges that Alderton "handle[s] most of this work [him]self," indicating that this may be no more than "mere puffery."

Whatever Drummond represented to Picard in April 2024, Picard's addendum to his and Easterday's offer letters appears to limit their employment to areas where Picard and CPM do not compete—the single-screw market.  The prior letter does not contradict this.  To the contrary, the letter substantiates the notion that Picard views these markets differently and had early discussions with Drummond about him operating in the single-screw market.  Drummond's comments that he would need training in these markets belie CPM's attempts to wave any distinction away.  The comments also call into question CPM's suggestion that "Picard would have no reason to hire Drummond and Easterday to sell [single-screw extrusion] aftermarket parts at that high of a

level—it would be like hiring an airplane engineer to design bicycles[.]" (Ross Suppl. Decl. ¶ 6.) Clearly, Picard hired Drummond and Easterday with the expectation that they would at least service single-screw customers. Perhaps Picard's business decision was unwise, or perhaps it simply found a lucrative market for "bicycles designed by an airplane engineer."

The Court is left with too many questions on both the industry and the individuals' roles at Picard: Which single-screw and twin-screw customers overlap? Are those customers that Drummond and Easterday serviced or had information about? Are those customers that Drummond and Easterday will likely now target at Picard? How much do these customers contribute to CPM's overall market position? How does winning a customer harm CPM's reputation, rather than just its bottom line? Without answers to these questions, the Court is left to speculate as to how precisely CPM's customer goodwill and competitive position will be harmed. CPM is not required to calculate the harm that will likely accrue, but it is required to connect the dots to show *how* such harm will accrue. "[T]he burden remains on the movant to show more than a speculative risk to its reputation" and market standing. *Cheetah Miner*, 2023 WL 6601863, at *2. CPM has failed to meet its burden with clear and convincing evidence. This factor weighs heavily against granting a preliminary injunction.

### C. Substantial Harms to Others

The only entities that stand to suffer the consequences of the instant motion are the parties to the litigation. On one hand, CPM faces significant potential harms should its fears about Defendants' intentions and capabilities to unfairly compete come to fruition. But as discussed, CPM has not shown that harm to be more than speculative at this point. On the other hand, Drummond and Easterday stand to lose their livelihoods. Although CPM suggests that they can work as salespeople elsewhere, it acknowledges that the industry is served by only a handful of companies that compete with one another on a global scale. Drummond and Easterday's value

stems from their knowledge of this particular industry and CPM has not shown that their skills are easily transferable to another.  CPM argues that Drummond and Easterday "could obtain employment with a number of other businesses who do not compete directly with CPM, even including those in the manufacturing or extrusion industry."  (Pl.'s Mot. for Prelim. Inj. 16.)  But they do not make this showing, and their arguments about the overlap between single- and twin-screw extrusion markets makes *this* argument ring hollow.

Although courts sometimes refuse to credit the harms to an employee who willfully violates his noncompete agreement, *see, e.g., Park-Ohio Indus., Inc. v. Carter*, No.06-15652, 2007 WL 470405, at *11 (E.D. Mich., Feb. 8, 2007), this Court finds good reason to take a different tack here.  Drummond and Easterday signed these noncompete agreements years before and for different roles.  In Drummond's case, he apparently signed this when he was *an intern*.  Further, CPM has not sufficiently countered Picard's argument that CPM's employment practices are an anomaly in this industry.  This matters in an industry with few competitors that compete on such a large scale—it both suggests that the harm to CPM is low (because if it was high, other companies would likely need to protect themselves as well) and that the harm to Drummond and Easterday is high (because their options to employ their industry-specific skills is so limited).

The Court agrees that the potential harm to Picard is likely minimal.  But CPM has failed to adduce evidence suggesting its potential harms significantly outweigh the harms to Drummond and Easterday.  CPM's harms are speculative and likely slow moving, given the apparent sales cycle of the industry.  Drummond and Easterday's harms are certain and immediate.  This tips the balance of this factor commandingly in their favor.

### D. Public Interest

Finally, the public interest.  As other courts have observed, "It is the public policy of Michigan as embodied by statute to enforce reasonable non-competition provisions in employment

contracts." *Quest Car*, 2023 WL 9472302, at *4 (quoting *Whirlpool Corp. v. Burns*, 457 F. Supp. 2d 806, 813 (W.D. Mich. 2006)).  The same may be said for the protection of trade secrets, as embodied in the MUTSA.  Yet the public interest may also be served "by allowing a successful salesman to continue performing his trade." *Patio Enclosures*, 39 F. App'x at 970.  And the ability of courts to enforce noncompete agreements may change by the time this litigation concludes.  *See* Non-Compete Clause Rule, 89 Fed. Re. 38,342 (May 7, 2024).  Although this rule is not yet in effect, it does indicate a change in national public policy.  Still, the noncompete is just one aspect of CPM's claims; there is no basis to conclude that public policy has changed with respect to trade secrets.  The Court finds that this factor slightly favors CPM.

## IV. CONCLUSION

The Court ends where it began— a "preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary*, 228 F.3d at 739.  Although CPM has done enough to show it has at least two viable claims, it has failed to convince the Court that such an extraordinary remedy should issue.  Irreparable harm is an indispensable requirement, and CPM has come up short.  Defendants have successfully raised significant questions that cast doubt on CPM's contention that imminent and irreparable harm is likely.  CPM has not adequately answered those questions with clear and convincing evidence.  And its claims, while viable, do not give rise to a *per se* implication of imminent and irreparable harm.  Conversely, the remedy CPM requests will likely result in swift and harsh consequences to Drummond and Easterday.  Although

Michigan public policy favors the enforcement of noncompete agreements and the protection of trade secrets, this alone does not carry the day.  CPM's motion for a preliminary injunction will be denied.

      An order will enter consistent with this Opinion.


Dated: August 5, 2024                     /s/ Hala Y. Jarbou
                                              HALA Y. JARBOU
                                              CHIEF UNITED STATES DISTRICT JUDGE